IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GEORGIA CASUALTY & SURETY
COMPANY,

      Plaintiff,

v.

EXCALIBUR REINSURANCE
CORPORATION f/k/a PMA Capital
Insurance Company,

      Defendants.

      CIVIL ACTION NO.

      1:13-cv-00456-JEC

## ORDER & OPINION

This case is before the Court on defendant's Motion to Dismiss the First Amended (Verified) Complaint [11]. Having reviewed the record and the arguments of the parties, the Court concludes that defendant's Motion to Dismiss the First Amended (Verified) Complaint [11] should be **GRANTED**. Because it is superseded, defendant's earlier Motion to Dismiss [6] is **DENIED as moot**. Further motions are also rendered moot by this Order and are also **DENIED as moot:** plaintiff's Motion for an Expedited Hearing on Pending Motions and to Waive Usual Procedures [13]; plaintiff's Motion for Leave to Submit New Evidence in Opposition to Defendant's Motion to Dismiss and in Support of Plaintiff's Motion to Waive the Usual Procedures [17]; and defendant's Motion to Strike [19].

<u>**BACKGROUND**</u>

I.   <u>**THE PARTIES AND CONTRACTS**</u>

This case arises from a dispute over two reinsurance contracts. Georgia Casualty & Surety Company ("plaintiff") is an insurance company, incorporated under Georgia law.   (Pl.'s Am. Compl. [9] at ¶ 1.)   It was acquired by Columbia Mutual Insurance Company ("CMI") in 2008.   (*Id.*)   Since August of 2009, plaintiff has divided its management operations between Missouri and Georgia.   (*Id.*)   Excalibur Reinsurance Corporation ("defendant") is a reinsurance company incorporated and based in Pennsylvania.   (*Id.* at ¶ 2.)   It is the successor in interest and name to PMA Capital Insurance Company ("PMA").   (*Id.* at ¶ 3.)

Plaintiff and PMA entered into two reinsurance contracts, both effective January 1, 2003.   (Pl.'s Am. Compl. [9] at ¶¶ 8-15.)   Under one, the First Excess Multiple Line Reinsurance Contract ("First Excess Contract"), plaintiff bore responsibility for the first $300,000 of ultimate net loss with respect to any one risk in each loss, and defendant bore the remaining net losses up to $700,000 for any one risk in each loss, with a cap of $1,400,000 for all risks in any one occurrence.   (*Id.* at ¶ 8; First Excess Contract [1-1] at Art. IV.)   Under the other contract, the Second Excess Multiple Line Reinsurance Contract ("Second Excess Contract"), plaintiff bore the first $1,000,000 of ultimate net loss with respect to any one risk in

2

each loss covered, and defendant was liable for the remainder, capped at $5,000,000 for any single risk in each loss and capped at $7,500,000 for all risks involved in any single occurrence. (Pl.'s Am. Compl. [9] at ¶ 12; Second Excess Contract [1-2] at Art. IV.)

Both contracts contain mandatory arbitration clauses. (First Excess Contract [1-1] at Art. XXIV; Second Excess Contract [1-2] at Art. XXIV.) The clauses are not identical. Importantly for the present dispute, the First Excess Contract has a choice of laws provision that states, "[a]ny arbitration proceedings shall take place at a location mutually agreed upon by the parties to this Contract, but notwithstanding the location of the arbitration, all proceedings pursuant hereto shall be governed by the law of the state in which [plaintiff] has its principal office." (First Excess Contract [1-1] at Art. XXIV(E).) Also important in this dispute, the Second Excess Contract states that "any dispute arising out of this Contract shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire, meeting in Atlanta, Georgia, unless otherwise agreed." (Second Excess Contract [1-2] at Art. XXIV(A).) Thus, the First Excess Contract contains a choice of laws provision but no forum selection clause, and the Second Excess Contract contains a forum selection clause but no choice of laws provision.

3

## II.   <u>THE UNDERLYING LITIGATION AND INSURANCE CLAIMS</u>

The loss that forms the basis of the dispute between the parties arises from a lawsuit filed in November of 2006 by Douglas Asphalt Company ("DAC") against Applied Technical Services, Inc. ("ATS"). The facts and resolution of that dispute are more fully set out in *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146 (11th Cir. 2011). Briefly, ATS, an insured of plaintiff, was found liable in tort after a jury trial in district court.[1]   The verdict was appealed to the Eleventh Circuit, which reversed on the grounds that the district court erred in not granting ATS judgment as a matter of law. *Id.* at 1156.  It seems probable that the case only made it to trial because the law firm plaintiff hired to defend ATS, Drew, Eckl & Farnum, LLC ("Drew Eckl"), neglected to move for summary judgment on all counts. *Id.* at 1150.

While the ATS trial verdict was under appeal, plaintiff entered a "high low memorandum of agreement" ("high-low agreement") with ATS, guaranteeing that, whatever the outcome of the appeal, plaintiff

---

[1] ATS had been hired by the Georgia Department of Transportation ("GDOT") to test the asphalt used by DAC in DAC's road paving contract with GDOT. (Pl.'s Am. Compl. [9] at ¶¶ 16-18.)  ATS reported to GDOT that the asphalt samples it tested had deficient amounts of hydrated lime, an ingredient that makes the asphalt resistant to moisture damage. *Douglas Asphalt Co.*, 657 F.3d at 1149-50.  GDOT subsequently declared DAC in default on the paving contract.  *Id.* at 1150.  Based on the contention that ATS' testing was faulty, DAC sued ATS for defamation, negligence, and other causes of action.  (Pl.'s Am. Compl. [9] at ¶¶ 19-21.)

4

would pay ATS no less than $3,000,000 and no more than $12,000,000. (Pl.'s Am. Compl. [9] at ¶ 23.)   Shortly after plaintiff concluded this high-low agreement, the Eleventh Circuit vacated the judgment against ATS.   *Douglas Asphalt Co.*, 657 F.3d at 1154-56.   Plaintiff estimates that it has expended $3,000,000 under the high-low agreement and $2,641,692 in litigation expenses. (Pl.'s Am. Compl. [9] at ¶ 25.)   By plaintiff's calculations, there is "currently due and owing from [defendant] to [plaintiff] the sum of $1,418,708 under the two reinsurance contracts." (*Id.* at ¶ 27.)

Plaintiff kept defendant apprised of these litigation and settlement developments and notified it that there would likely be reinsurance claims. (*Id.* at ¶¶ 22 and 24.)   Defendant, however, has thus far not paid the amounts plaintiff has claimed it owes under the contracts. (*Id.* at ¶ 25.)   Defendant admits this, but cites as justification plaintiff's promise that it would seek recovery for malpractice against Drew Eckl and defendant's lack of consent to the high-low agreement. (Mot. to Dismiss [11-1] at 4-5.)   Defendant believes that recovery from Drew Eckl would cover any amounts defendant would have to pay plaintiff under the contract and that a suit against the above law firm is a prerequisite to determining what, if anything, defendant is required to pay under the contracts. (*Id.* at 6.)

In late 2012 and early 2013, Plaintiff demanded arbitration of

5

what it considered defendant's breach of the contracts. (*Id.* at 1.) Defendant, for its part, demanded arbitration on a counterclaim that plaintiff has unpaid premiums due on the First Excess Contract. (*Id.*) Although both parties are in agreement that arbitration is appropriate, defendant has refused plaintiff's demands for consolidated arbitration of all the claims under both contracts. (*Id.* at 2.) Defendant also has informed plaintiff that it will request that the arbitrators stay arbitration pending the resolution of plaintiff's claims against Drew Eckl. (Mot. to Dismiss [11-1] at 6.) Plaintiff believes this to be a delaying tactic, as it has gathered evidence purporting to show that defendant is in dire financial straits and will soon be unable to pay any judgment required of it. (Pl.'s Am. Compl. [9] at ¶ 48.)

Because of its belief that defendant is in breach of its contractual obligations, including its obligations under the arbitration agreement, plaintiff filed suit in this Court. Plaintiff requests that the Court order consolidated arbitration to be held in Atlanta, Georgia. (Pl.'s Am. Compl. [9] at ¶¶ 29-37; Pl.'s First Mem. [10] at 9-17.) Plaintiff also seeks an order from the Court denying defendant's attempt to stay arbitration pending the resolution of plaintiff's potential suit against the Drew Eckl. (Pl.'s Am. Compl. [9] at ¶¶ 38-44; Pl.'s First Mem. [10] at 18-20.) Based on its contentions that defendant is approaching insolvency,

6

plaintiff requests that this Court require defendant to post security sufficient to cover the loss and loss adjustment expenses plaintiff claims. (Pl.'s Am. Compl. [9] at ¶¶ 45-50; Pl.'s First Mem. [10] at 20-25; Pl.'s Second Mem. [12] at 1-4.) Finally, if the Court grants plaintiff the foregoing relief, plaintiff further seeks a stay of further proceedings in this Court pending the outcome of the arbitration. (Pl.'s Am. Compl. [9] at ¶¶ 51-53.) Defendant has moved to dismiss all of plaintiff's claims.

**DISCUSSION**

**I.   MOTION TO DISMISS STANDARD**

In deciding a motion to dismiss under Federal Rule 12(b)(6), the Court assumes that all of the allegations in the complaint are true and construes all of the facts in favor of the plaintiff. *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). That said, in order to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim [for] relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "facial[ly] plausib[le]" when it is supported with facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts will "eliminate any allegations in the complaint that are merely legal conclusions." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290

7

(11th Cir. 2010).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

II.  **PLAINTIFF'S COMPLAINT**

    A.  <u>May the Court Order the Arbitration Proceedings to be Consolidated and Located in Atlanta, Georgia?</u>

For this Court to determine whether it is appropriate to order consolidation of the arbitration proceedings it must first determine the applicable law governing arbitration under the contracts.

Responding to "the longstanding judicial hostility toward arbitration," Congress in 1925 passed the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16.  *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005).  Because arbitration is both in the public interest, insofar as it is "speedier and less costly than litigation," and in private interests, in that parties bargain for it in their contracts, the FAA "embodies a 'liberal federal policy favoring arbitration agreements.'"  *Id.*  Pursuant to these policy goals, the FAA empowers a party to a contract relating to a maritime transaction or interstate commerce to compel its counterpart to arbitrate, rather than litigate, a dispute that has been made arbitrable under the terms of that contract.  9 U.S.C. § 4; *Jenkins v. First Am. Cash Advance of Georgia, LLC*, 400 F.3d 868, 876 (11th

Cir. 2005).[2]  In these situations, the FAA requires a court to order the parties into arbitration, provided that it is satisfied that the arbitration agreement is valid.  *Id.*

Arbitration under the FAA's rules is not mandatory.  As the Supreme Court has explained, although the FAA generally preempts state arbitration laws:

> [I]t does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself.  Indeed, such a result would be quite inimical to the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms.  Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit.

*Volt Info. Sci., Inc. v. Bd. of Tr. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989).  Thus, the FAA does not necessarily displace state law, even where the contract involves a maritime transaction or interstate commerce, because parties to those contracts may opt for state arbitration laws or some other set of

---

[2]  The Supreme Court has indicated that the FAA should apply to contracts falling within the scope of federal legislative power. *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 274 (1995)("[T]his Court has previously described the Act's reach expansively as coinciding with that of the Commerce Clause.") For nearly seventy years, the Supreme Court has found insurance to fall within Congress' legislative power under the Commerce Clause. *See United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944).  The parties are correct in recognizing that the FAA is therefore applicable as the default law governing the contracts at issue. *See Protective Life Ins. Corp. v. Lincoln Nat'l Life Ins. Corp.*, 873 F.2d 281 (11th Cir. 1989)(applying the FAA to arbitration between insurers on an insurance contract).

AO 72A
(Rev.8/82)

rules in lieu of the FAA. *Id.* at 470 ("[A]pplication of the California [Arbitration Act] is not preempted by the Federal Arbitration Act...in a case where the parties have agreed that their arbitration agreement will be governed by the law of California.")(citation removed).

The liberty of contracting parties to choose between the FAA and state arbitration law is important in this case because the FAA treats the issue of consolidation differently than do some state arbitration laws. Specifically, the FAA lacks any provision permitting courts to consolidate under a single arbitration disputes arising from different contracts. The Eleventh Circuit, reflecting the majority view among the circuit courts, has made clear that this absence means that courts may not order consolidation of arbitration unless the contracts involved so provide for consolidation. *Protective Life Ins. Corp. v. Lincoln Nat'l Life Ins. Corp.*, 873 F.2d 281, 282 (11th Cir. 1989)("Parties may negotiate for and include provisions for consolidation of arbitration proceedings in their arbitration agreements, but if such provisions are absent, federal courts may not read them in."). *See also Employers Ins. Co. of Wausau v. Century Indemnity Co.*, 443 F.3d 573 (7th Cir. 2006); *Shaw's Supermarkets, Inc. v. United Food and Commercial Workers Union, Local 791, AFL-CIO*, 321 F.3d 251 (1st Cir. 2003); *Baesler v. Cont'l Grain*

10

*Co.*, 900 F.2d 1193 (8th Cir. 1990).[3]   As the Supreme Court has recently emphasized in the related context of class arbitration, "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so."  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010)(rejecting the notion that such agreement may be inferred).   Thus, under the FAA, consolidation is only permissible where explicitly stipulated by contract.

In contrast to the FAA, some state arbitration acts permit courts to order consolidation under certain circumstances, even absent contractual provisions permitting it.  The Georgia Arbitration Code ("GAC") is typical of these and states in relevant part:

---

[3]   An earlier First Circuit decision that plaintiff relies upon in arguing that the FAA permits consolidation is not on point, as it merely held that a state arbitration law that permitted consolidation and did not conflict with the FAA (which otherwise applied to the arbitration agreement), permitted the court to consolidate.  *New England Energy Inc. v. Keystone Shipping Co.*, 855 F.2d 1, 5 (1st Cir. 1988), *cert. denied*, 489 U.S. 1077 (1989)("We disagree that ordering consolidation pursuant to a state statute when the contract is silent on the subject improperly modifies the agreement struck by the parties in violation of section four [of the FAA].")  The First Circuit, in one of only two subsequent cases discussing *New England Energy, Inc.*, made clear that the earlier decision did not authorize courts to impose consolidation where there is neither statutory nor contractual license.  *Seguro de Servicio de Salud de Puerto Rico v. McAuto Sys. Grp., Inc.*, 878 F.2d 5, 8 (1st Cir. 1989)(stating that *New England Energy, Inc.* did not answer the question of whether courts "have the power to consolidate separate arbitration proceedings [where] neither the contracts nor the state law governing the contracts authorized the procedure").

AO 72A
(Rev.8/82)

> [u]nless otherwise provided in the arbitration agreement,
> a party to an arbitration agreement may petition the court
> to consolidate separate arbitration proceedings, and the
> court may order consolidation of separate arbitration
> proceedings when: (1) Separate arbitration agreements or
> proceedings exist between the same parties or one party is
> a party to a separate arbitration agreement or proceeding
> with a third party; (2) The disputes arise from the same
> transactions or series of related transactions; and (3)
> There is a common issue or issues of law or fact creating
> the possibility of conflicting rulings by more than one
> arbitrator or panel of arbitrators.

O.C.G.A. § 9-9-6(e).[4]  Thus, in Georgia and other jurisdictions that

adopt similar laws, courts may consolidate arbitration where there

are common parties, common transactions, and common issues of law or

fact.

---

[4]  The GAC served in part as the model for the Revised Uniform
Arbitration Act ("RUAA") of 2000, which is in turn the model for many
state arbitration laws.  RUAA § 10, Comment 3 ("Section 10 is an
adaptation of consolidation provisions in the California and Georgia
statutes.")  The RUAA states that, absent express contract provision
to the contrary:

> [T]he court may order consolidation of separate arbitration
> proceedings as to all or some of the claims if: (1) There
> are separate agreements to arbitrate or separate
> arbitration proceedings between the same persons or one of
> them is a party to a separate agreement to arbitrate or a
> separate arbitration proceeding with a third person; (2)
> The claims subject to the agreements to arbitrate arise in
> substantial part from the same transaction or series of
> related transactions; (3) The existence of a common issue
> of law or fact creates the possibility of conflicting
> decisions in the separate arbitration proceedings; and (4)
> Prejudice resulting from a failure to consolidate is not
> outweighed by the risk of undue delay or prejudice to the
> rights of or hardship to parties opposing consolidation.

RUAA § 10(a).

12

Thus, there are two conditions under which a court may compel arbitration of separate contractual disputes under a single, consolidated arbitration proceeding.  If the FAA or a state arbitration act lacking a statutory consolidation provision applies, then a court may only consolidate the arbitration if the contracts expressly permit consolidation.  Alternatively, if a state arbitration act that allows courts to impose consolidation regardless of the contracts' terms governs the contracts, then a court may order consolidation where the statutory requirements are satisfied.

Turning to the contracts at issue in this case, the Second Excess Contract lacks any choice of laws provision, and thus both parties correctly recognize that it is governed by the FAA.  Further, the Second Excess Contract lacks any contractual provision expressly permitting consolidation.  Because the FAA governs the Second Excess Contract, and the FAA does not permit courts to consolidate arbitration where there is no express contractual provision allowing consolidation, it may not be consolidated with the First Excess Contract.

It takes two to consolidate, and therefore this disposes of the issue of consolidation.  For purposes of completeness, however, the Court analyzes the First Excess Contract. As with the Second Excess Contract, the First Excess Contract lacks a consolidation clause. Here, the parties dispute what body of law governs the contract.

13

Plaintiff believes Georgia law applies.  As discussed above, the GAC permits courts to consolidate under certain circumstances.  Defendant believes that Missouri law, or alternatively the FAA, applies to the contract, and that neither of these would permit the Court to consolidate.

Article XXIV is the arbitration provision of the First Excess Contract.  Subsection (E) reads: "Any arbitration proceedings shall take place at a location mutually agreed upon by the parties to this Contract, but notwithstanding the location of the arbitration, *all proceedings pursuant hereto shall be governed by the law of the state in which [plaintiff] has its principal office*." (First Excess Contract, [1.1] at Art. XXIV(E))(emphasis added).  Thus, there seems a clear intent for arbitration not to be conducted under default FAA rules.  The only ambiguity is the location of plaintiff's principal office, which determines what law applies.

At the time of contracting, the parties agree that plaintiff had its principal office in Georgia.  Since that time, however, plaintiff was acquired by CMI and has moved most of its executive functions to Columbia, Missouri.  Plaintiff contends that Georgia is still its principal office, citing the facts that it remains incorporated under Georgia law and still conducts its "underwriting, claims and loss control and marketing functions" in Georgia.  (Pl.'s Am. Compl. [9] at ¶ 1.)  Defendant, in contrast, points out that "principal office"

14

is statutorily defined in Georgia corporations law as "the office in or out of this state so designated in the annual registration where the principal executive offices of a domestic or foreign corporation are located." O.C.G.A. § 14-2-140(22).[5] In plaintiff's most recent annual registration statement, the "Statutory Home Office" lists a Georgia address, but the "Main Administrative Office," "Mail Address," and "Primary Location of Books and Records" list Missouri addresses, as do the officers and directors. (Annual Statement [11-16] at Ex. N, p.2.)

Because "principal office" is not defined in the contract, and the contract was executed in Georgia, the Court finds the Georgia statutory definition the best indication of the contract's meaning. It is clear from the annual registration statement that Missouri is the location of the offices where plaintiff performs its executive functions. The only functions conducted from the Georgia offices are, as plaintiff admits, "its underwriting, claims and loss control and marketing functions." (Pl.'s Am. Compl. [9] at ¶ 1.) It even

---

[5] Regardless of the body of law that applies to the arbitration, in interpreting the overall contract a district court presiding over a diversity action must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941); *Wammock v. Celotex Corp.*, 835 F.2d 818, 829 (11th Cir. 1988). Because the contract was executed in Georgia, and Georgia follows the doctrine of *lex loci contractus*, it is interpreted under Georgia law. *Gen. Tel. Co. of the Se. v. Trimm*, 252 Ga. 95 (1984); *Shorewood Packaging Corp. v. Commercial Union Ins. Co.*, 865 F. Supp. 1577, 1578 (N.D. Ga. 1994).

refers to its Missouri offices as its "administrative offices." (*Id.*) On the basis of plaintiff's admissions and the information in its Annual Registration, the principal executive office of plaintiff is plainly located in Missouri. Thus, according to the contract terms, Missouri law is the law indicated in the choice of laws provision as governing the arbitration proceedings.

Missouri has adopted the original 1955 version of the Uniform Arbitration Act ("UAA") in its Missouri Arbitration Act ("MAA"). *See* Mo. St. §§ 435.350-435.470. The UAA, unlike the later 2000 version, the Revised Uniform Arbitration Act ("RUAA"), lacks a consolidation provision. Whatever the reason for not adopting the RUAA, the Missouri legislature has not done so. As a result, nowhere in the MAA is consolidation addressed, and this Court can find no precedent supporting the notion that courts have interpreted the MAA to allow courts to consolidate arbitration. Thus, following the general principles discussed above, the First Excess Contract is ineligible for consolidation. For this Court to rule otherwise would be to act without statutory or contractual warrant.

Defendant provides an alternative theory that the FAA governs the First Excess Contract. Defendant argues that the choice of laws provision in the First Excess Contract is insufficient to signal an intent to opt out of the FAA, based on Supreme Court precedent. *See*

16

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995).[6]
*Mastrobuono* presented the Supreme Court with a contract that
contained a choice of laws provision that indicated New York state
law would apply to the contract, and an arbitration provision that
seemed to allow the arbitrators to award punitive damages, which ran
counter to New York arbitration law. *Id.* at 59-60. Faced with this
conflict, the Court held that "the best way to harmonize the choice-
of-law provision with the arbitration provision is to read 'the laws
of the State of New York' to encompass substantive principles that
New York courts would apply, but not to include special rules
limiting the authority of arbitrators." *Id.* at 63-64.

Some circuits have construed *Mastrobuono* broadly. For instance,
the Fifth Circuit has stated that after *Mastrobuono*, "a choice-of-law
provision is insufficient, by itself, to demonstrate the parties'
clear intent to depart from the FAA's default rules." *Action Indus.,
Inc. v. United States Fid. & Guar. Co.*, 358 F.3d 337, 342 (5th Cir.

---

[6] Alone among the circuits, the Eleventh Circuit has not
addressed *Mastrobuono* on the issue of the adequacy of a choice of
laws provision to signal an intent to opt out of the FAA. *See Action
Indus., Inc. v. United States Fid. & Guar. Co.*, 358 F.3d 337, 341-342
(5th Cir. 2004); *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1270 (9th
Cir. 2002); *Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 293
(3d Cir. 2001); *Porter Hayden Co. v. Century Indem. Co.*, 136 F.3d
380, 382-83 (4th Cir. 1998); *Ferro Corp. v. Garrison Indus., Inc.*,
142 F.3d 926, 937 (6th Cir. 1998); *UHC Mgmt. Co., Inc. v. Computer
Sci. Corp.*, 148 F.3d 992, 997 (8th Cir. 1998); *PaineWebber Inc. v.
Elahi*, 87 F.3d 589, 593-94 (1st Cir. 1996); *Nat'l Union Fire Ins. Co.
v. Belco Petroleum Corp.*, 88 F.3d 129, 134-35 (2d Cir. 1996).

AO 72A
(Rev.8/82)

2004).  *See also Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 296 (3d Cir. 2001)("[W]e need to establish a default rule, and the one we adopt is that a generic choice-of-law clause, standing alone, is insufficient to support a finding that contracting parties intended to opt out of the FAA's default standards."); *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1270 (9th Cir. 2002)("[A] general choice-of-law clause within an arbitration provision does not trump the presumption that the FAA supplies the rules for arbitration.")

Even assuming the Eleventh Circuit would read *Mastrobuono* as sweepingly as those circuits have done, the choice of laws provision in the First Excess Contract would be sufficient to opt out of the FAA, as it differs substantially from the contract in *Mastrobuono*. First, it does not conflict with other parts of the contract, and therefore requires no construction "to give effect to all [the contract's] provisions and to render them consistent with each other." *Mastrobuono*, 514 U.S. at 63.  Second, it is placed within the arbitration clause, strongly implying that it is meant to apply to the arbitration of disputes.  The choice of laws provision in the *Mastrobuono* contract was placed outside the arbitration provision, which suggested to the Court that might cover only the "substantive rights and obligations" of the parties and not the "decisional law" to be applied in arbitration.  *Id.* at 60.  Third, the First Excess Contract's choice of laws provision specifically instructs the

18

arbitrators to apply state law in conducting the "proceedings," stating that "all proceedings pursuant hereto shall be governed by the law of the state in which the Company has its principal office." ([1-1] at Art. XXIV(E).)  This implies an intent for state procedural law to apply, in this context state arbitration law.  It would be difficult to construe the clause as referring only to the substantive rights and obligations under state law.  Finally, it is difficult to see what would be sufficient to opt out of the FAA, if the instant provision is inadequate.  Indeed, it is similar in form and substance to the one found sufficient to opt out of the FAA in *Volt Info. Sci., Inc.*, which stated, "[t]he Contract shall be governed by the law of the place where the Project is located." *Volt Info. Sci., Inc.*, 489 U.S. at 470.

Thus, because neither contract contains a consolidation clause nor is governed by arbitration law that permits judicial consolidation, this Court must refuse plaintiff's plea for consolidation.  It follows that, because the Court may not order consolidation, it also may not designate a forum for that consolidated arbitration.[7]

---

[7]   The Court notes there is no forum indicated in the First Excess Contract.  It merely states that "[a]ny arbitration proceedings shall take place at a location mutually agreed upon by the parties to this Contract . . ." (First Excess Contract [1-1] at Art. XXIV(E).)  In contrast, the Second Excess Contract specifies that the arbitrators would meet "in Atlanta, Georgia, unless

B.   May the Court Order the Arbitrators not to Stay
     Arbitration?

Plaintiff contends that this Court may order arbitration immediately, in the face of defendant's claim that it will petition the arbitrators to stay arbitration until plaintiff pursues recovery from Drew Eckl.  Defendant differs, contending that the decision to stay arbitration is within the authority of the arbitrators, not this Court.

Supreme Court jurisprudence on arbitration allocates to courts the authority to determine any threshold "question of arbitrability," but to arbitrators the authority to decide "procedural questions." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). Questions of arbitrability arise:

> [I]n the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

*Id.* at 83-84.  *See also Klay v. United Healthgroup, Inc.*, 376 F.3d 1092 (11th Cir. 2004)("*Howsam* states that, unless an arbitration agreement otherwise stipulates, a court is empowered only to

otherwise agreed."  (Second Excess Contract [1-2] at Art. XXIV(A).)
It thus seems that plaintiff may insist on arbitrating the Second
Excess Contract in Atlanta, but not the First Excess Contract.

20

determine the 'substantive' issue of arbitrability--that is, whether a particular dispute falls within the scope of an arbitration clause--and the necessary threshold question of whether that clause is enforceable.")(citation removed).   This is consistent with the principal that arbitration is a matter of contract, and therefore of the parties' consent to be bound.  *See Volt Info. Sci., Inc.*, 489 U.S. at 478 (The FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms."); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)(Regarding arbitration agreements, "as with any other contract, the parties' intentions control."); *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1221 (11th Cir. 2000)("It is well established that arbitration is a creature of contract and neither party can be compelled to arbitrate when he has not agreed to do so.")(internal quotations removed).   Thus, courts have generally limited questions of arbitrability to determinations of whether the contracting parties actually agreed to arbitrate, whether an arbitration agreement binds third parties, and whether the arbitration clause governs a particular dispute between the parties.  *Howsam*, 537 U.S. at 84.

On the other hand, once a court has determined that the parties have an agreement to arbitrate, "procedural questions which grow out of the dispute and bear on its final disposition are presumptively

21

*not* for the judge, but for an arbitrator, to decide." *Id.* (citation and internal quotations removed). Procedural questions reserved for arbitrators include questions of standing, laches, res judicata, procedural timeliness, collateral estoppel, and equitable estoppel. *Aluminum Brick and Glass Workers Int'l Union v. AAA Plumbing Pottery Corp.*, 991 F.2d 1545, 1550 (11th Cir. 1993). Only where the arbitrators have departed from the requirements of the contract may the courts intervene in the procedural decisions of the arbitrators. *See Sterling Fin. Inv. Grp., Inc. v. Hammer*, 393 F.3d 1223, 1225 (11th Cir. 2004)("[A] federal district court, pursuant to 9 U.S.C. § 4, has jurisdiction to enforce a forum selection clause in a valid arbitration agreement that has been disregarded by the arbitrators.")

This division of labor requires the court to tread carefully so as not to exceed the authority granted to it and thereby violate the "principle that, in determining whether a dispute is arbitrable, a court should not rule on the potential merits of the underlying claims." *Aluminum Brick and Glass Workers Int'l Union*, 991 F.2d at 1549-50. On this basis, the question as to whether this Court may order the arbitrators not to stay the arbitration pending any potential recovery against Drew Eckl is easily answered: it may not. If defendant is not contractually required to reimburse plaintiff until plaintiff has pursued recovery against Drew Eckl, as defendant contends, then the Court would be infringing on the defendant's

contractual rights in ordering the arbitrators not to stay arbitration. That is, determining this issue would entangle the Court in questions involving the contractual prerequisites to defendant's obligation to reimburse plaintiff, questions that would go to the merits of the dispute between the parties. *See Id.* at 1550 (Addressing whether a particular party is a necessary participant in arbitration "requires interpretation of the [underlying contract] and must be decided by an arbitrator.") Thus, this Court must decline.

C.   <u>May the Court Require Defendant to Post Security?</u>

Plaintiff contends that defendant is likely nearing insolvency, and thus that the Court should require defendant to post a security bond to ensure that any future judgment will be paid. Plaintiff alternatively argues that the contract itself requires defendant to post security. Defendant responds that this would involve the Court in matters proper to the arbitrators, and in any case is contrary to law. Defendant further denies plaintiff's accusation that defendant is approaching insolvency.

Plaintiff relies on a First Circuit case for the proposition that "a district court can grant injunctive relief in an arbitrable dispute pending arbitration, provided the prerequisites for injunctive relief are satisfied." *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 (1st Cir. 1986). These prerequisites for injunctive relief are those generally recognized both in this Circuit and the

23

First Circuit: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiffs outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)(quoting *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994)). *See Teradyne, Inc.,* 797 F.2d at 51-52 (listing the same factors). Plaintiff believes that it can satisfy these factors, and thus that it should be granted injunctive relief. However, this is not quite the case.

First, the *Teradyne* court's view that a court may grant preliminary injunctive relief in an otherwise arbitrable dispute has not been adopted in this Circuit. In fact, the Eleventh Circuit has discussed the *Teradyne* approach with disapproval. *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1529 (11th Cir. 1994)(It "tortures the express language of [the precedent upon which it was based] and runs counter to established equitable principles.") The *Rosen* court began with the principle that "[i]t is axiomatic that equitable relief is only available where there is no adequate remedy at law; cases in which the remedy sought is the recovery of money damages do not fall within the jurisdiction of equity." *Id.* at 1527. It follows from this that courts may not grant injunctive relief in the form of

24

requiring a defendant to post security when the plaintiff ultimately seeks only money damages in the case. *Id.* at 1529 (finding asset freeze inappropriate where the plaintiff ultimately sought only money damages); *see also Levi Strauss & Co.*, 51 F.3d at 987 (distinguishing from *Rosen* where the plaintiff sought a permanent injunction in addition to the preliminary relief of the asset freeze). In the present case, what plaintiff plainly seeks from defendant is reimbursement under the terms of the reinsurance contracts. With such reimbursement, plaintiff would have no further claim for relief. Plaintiff does not seek a permanent injunction or other equitable remedy to make it whole. As such, the matter falls well within the rule of *Rosen*.

Alternatively, plaintiff points to the contracts to support its argument that defendant is, if not equitably required to post security, contractually required to do so. (Pl.'s First Mem. [10] at 20-25; Pl.'s Second Mem. [12] at 1-4.)[8] This argument, whatever its ultimate merits, runs afoul of the rule of this Circuit, discussed above, that in an arbitrable contract dispute, the courts may not engage in further contractual interpretation than what is necessary

---

[8] Plaintiff bases this argument on the "Unauthorized Reinsurers" clauses of the contracts, claiming that those provisions require defendant, because it is alleged now to be an unauthorized reinsurer under Georgia law, to provide letters of credit, escrow accounts, or cash advances to plaintiff. (*See* First Excess Contract [1-1] at Art. XXII and Second Excess Contract [1-2] at Art. XXII.)

AO 72A
(Rev.8/82)

to determine arbitrability.  Thus, as with plaintiff's plea for this Court to order the arbitrators not to stay proceedings pending the resolution of any malpractice recovery from Drew Eckl, this Court may not delve into the contract to determine if it requires defendant to post security.

    D.   <u>Should the Court Stay This Action Pending the Outcome of the Arbitration?</u>

Plaintiff's final plea is for the Court to stay this litigation pending the outcome of the arbitration that plaintiff seeks this Court to order.  However, plaintiff's request was made contingent upon its success on the other issues. (Pl.'s Am. Compl. [9] at ¶ 52.)  Because this Court dismisses those pleas for relief, there is no reason to grant the stay.

**CONCLUSION**

It is ordered by this Court that defendant's Motion to Dismiss the First Amended (Verified) Complaint [11] be **GRANTED**.  Because it is superseded, defendant's earlier Motion to Dismiss [6] is **DENIED as moot**.  Further motions are also rendered moot by this Order.  Plaintiff's Motion for an Expedited Hearing on Pending Motions and to Waive the Usual Procedures [13] is **DENIED as moot**.  Plaintiff's Motion for Leave to Submit New Evidence in Opposition to Defendant's Motion to Dismiss and in Support of Plaintiff's Motion to Waive the Usual Procedures [17] is **DENIED as moot**.  Defendant's Motion to

26

Strike [19] is **DENIED as moot**.  The Clerk shall close this action.


        SO ORDERED, this <u>13th</u> day of <u>MARCH</u>, 2014.



                        <u>/s/ Julie E. Carnes</u>
                        JULIE E. CARNES
                        CHIEF UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)